IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SEATRADE GROUP N.V., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-05-2771 |
| | § | |
| 6,785.5 METRIC TONS OF CEMENT, | § | |
| *in rem*, AND ROYAL WHITE | § | |
| CEMENT INC., *in personam*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

By this court's order, 1,325 metric tons of cement was arrested and remains in a warehouse in the Southern District of Texas. The purpose of the arrest is to secure the deadfreight claim, pending arbitration. The cargo owner, Royal White Cement, moves to vacate the arrest. The plaintiff-in-intervention, Emar Shipping, asserts that it is the charterer/disponent owner of the vessel and moves for an order for the interlocutory sale of the arrested cargo.[1]

A hearing under Rule E(4)(f) was held on October 18, 2005, to show cause why the arrest of the cargo should not be vacated. Based on the motions and responses, the parties' submissions, the arguments of counsel, and the applicable law, this court denies Royal White Cement's motion to vacate the arrest and orders the interlocutory sale of the cargo.

---

[1] Emar also moved for leave to file a reply to Royal White's response. (Docket Entry No. 35). This motion is granted.

The reasons for this decision are explained below.

## I. Background

Royal White executed two charter party agreements to ship 8,000 metric tons of cement from Alexandria, Egypt to Houston, Texas, one with Emar and one with Seatrade.[2] (Docket Entry No. 1, p. 2; Docket Entry No. 34, Ex. A, p. 2). Royal White allegedly delivered the cement to the dock in larger bags than the agreements called for. The larger size of the bags reduced the number of bags that the ship, the M/V SPRING DELI, could carry.[3] (Docket Entry No. 1, p. 2). The charter party agreements had anticipated 8,000 metric tons of cement; only 6,785.5 metric tons were loaded. On August 8, 2005, Royal White paid Emar for the carriage of the 6,785.5 metric tons of transported cement at the agreed rate of $55.00 per metric ton. Emar in turn paid Seatrade at the rate that it had agreed to pay, $47.00 per metric ton. Seatrade filed suit against Royal White on August 10, 2005 for payment of the deadfreight.[4] (*Id.*). Emar intervened in this suit on September 15,

---

[2] A charter party is a "specialized form of contract for the hire of an entire ship, specified by name. . . . [It is] a private contract, and the parties are free to allocate risks contractually either by express contractual provision or by allocating specific duties concerning the cargo, the voyage, and the ship." THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 11–1 (3d ed. 2001).

[3] The parties alternately refer to this vessel as the "M/V SPRING DELL" and the "M/V SPRING DELI." It is clear the parties intend to reference the same vessel. This court refers to the vessel as the "M/V SPRING DELI," the name Seatrade, the owner of the vessel, uses.

[4] "Deadfreight" is "freight payable on cargo agreed by charterers to be shipped, but not actually shipped." *Peoples' Democratic Republic of Yemen v. Goodpasture, Inc.*, 782 F.2d 345, 350 (2d. Cir. 1986). "The vessel has set aside so much space for a particular cargo, which, but for that commitment, it could have set aside for another cargo and been paid for carrying." *Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co.*, 611 F. Supp. 665, 675 (D.N.J. 1985).

2005. (Docket Entry No. 7). On August 17, 2005, under this court's order, the United States Marshal arrested the cargo. On October 5, 2005, after Seatrade and Emar settled, Seatrade stipulated to a voluntary dismissal of its complaint. Emar's deadfreight claim against Royal White remains.

Royal Shipping disputes that Emar has a valid maritime lien against the cargo. Emar claims to be a charterer or disponent owner of the M/V SPRING DELI.[5] Royal White agrees that it executed a charter party with Emar on June 20, 2005 at a rate of $55.00 per metric ton, and that Emar was identified in that charter party as a disponent owner of the vessel. (Docket Entry No. 34, Ex. A, ¶¶ 6–7). Royal White contends, however, that Emar did not have the authority to charter the M/V SPRING DELI, making the charter party between Emar and Royal White is void and unenforceable. (Docket Entry No. 15, p. 2). Emar responds that, after securing the charter party with Royal White to transport the cargo at a rate of $55.00 per metric ton, it secured from Seatrade an agreement to supply the vessel and transport the cargo at a rate of $47.00 per metric ton. Emar argues that it performed these actions through a shipbroker, Seachart Marine. Emar received payment of the freight rate from Royal White and paid Seatrade, profiting from the difference between the freight it paid Seatrade and what Royal White paid. Royal White, in short, had

---

[5] A "disponent owner" does not hold legal title to a vessel, but for purposes of the charter party, acts as if it does. *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 693 n.1 (2d Cir. 1978). A disponent owner rents a vessel from the owners under a time charter and then acts as a contract carrier, transporting the goods. *Fairmont Shipping (H.K.), Ltd. v. Primary Indus.*, No. 86-3668, 1987 WL 9433 at * 2 n.1 (S.D.N.Y. April 7, 1987).

notice of Emar's role and agreed to pay the $55.00 per metric ton rate.

Approximately 1,325 metric tons of cement remains under arrest at Empire Stevedoring Co., Ltd.'s warehouse in the Southern District of Texas. (Docket Entry No. 21, p. 3; Docket Entry No. 32). Emar seeks the interlocutory sale of the remaining part of the arrested cargo because storage of the cargo costs $5,400 each month, diminishing the value, and the cargo is deteriorating. (*Id.*). Royal White contends that Emar lacks a valid lien on the cargo and asks this court to vacate the arrest of the cargo as wrongful. (Docket Entry No. 34, p. 6).

## II. The Applicable Legal Standards

Royal White asked for a postseizure hearing under Rule E(4)(f) of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure. Rule E(4)(f) provides in relevant part:

> Procedure for Release from Arrest or Attachment. Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

Supplemental Rules for Certain Admiralty and Maritime Claims R. E(4)(f). Courts have held that at a Rule E(4)(f) hearing, a plaintiff must show reasonable grounds for the arrest and attachment and that it should be maintained. *Salazar v. Atlantic Sun*, 881 F.2d 73, 79 (3d Cir. 1989); *Amstar Corp. v. S/S Alexandros T.*, 664 F.2d 904, 912 (4th Cir. 1981); *see also Parcel Tankers, Inc. v. Formosa Plastics Corp.*, 764 F.2d 1153, 1155 (5th Cir. 1985)

(holding that plaintiff bears burden of proof in other Rule E(4) issues). The plaintiff must show by a preponderance of the evidence that it is entitled to a valid lien. *Ocean Marine Mut. Ins. Ass'n (Europe) O.V. v. M/V LIA*, No. 99–2515, 1999 WL 679671 (E.D. La. Aug. 27, 1999) (citing *Amstar Corp.*, 664 F.2d at 912). This requires the plaintiff to make a *prima facie* showing that it is entitled to the damages sought and secured by the arrest and attachment. *Id.* at 2. A Rule E(4)(f) hearing is not intended definitely to resolve the dispute between the parties, but only to make a preliminary determination of whether there are reasonable grounds for issuance of the arrest warrant.

### III. Discussion

#### A. Does Emar Have a Valid Maritime Lien Against the Cargo?

Royal White argues that Emar is not the owner or operator of the M/V SPRING DELI and lacks a valid lien on Royal White's cargo. (Docket Entry No. 34, p. 6). Emar asserts that it was the disponent owner of the M/V SPRING DELI; it also argues that it need not show that it was a vessel owner because it may maintain a lien for breach of contract of affreightment as either a nonvessel owning carrier or as a charterer.

Entities owning and operating a vessel have a lien on the cargo transported on those vessels. *See, e.g., Bird of Paradise*, 72 U.S. 545, 555 (1866); *Lykes Lines Ltd. v. M/V BBC SEALAND*, 398 F.3d 319, 321 (5th Cir. 2005). Courts have allowed operators that do not own a vessel to assert a lien on the cargo transported on that vessel. *See, e.g., T.J. Stevenson & Co. v. 81,193 Bags of Flour*, 449 F.Supp. 84, 120 (S.D. Ala. 1976), *aff'd in part & rev'd*

*in part*, 629 F.2d 338, 375 (5th Cir. 1980). In *Logistics Management, Inc.*, 86 F.3d 908 (9th Cir. 1996), the Ninth Circuit held that a nonvessel owning common carrier is entitled to a maritime lien against cargo that it is responsible for transporting. *Id.* at 914.

The Fifth Circuit has recognized that liens may arise under a charter party. *Lykes Lines*, 398 F.3d at 323. "The lien arising under the charter party does not arise by operation of maritime law, as do other maritime liens. Rather this lien is a creature of contract and arises from the original charter party...." *Id.* (citing *Finora Co. v. Amitie Shipping*, 54 F.3d 209, 213 (4th Cir. 1995)); *see also E.A.S.T., Inc. of Stampford, Connecticut v. M/V ALAIA*, 876 F.2d 1168, 1175 (5th Cir. 1989) (recognizing maritime lien for breach of charter party). To perfect this lien, the cargo owner must receive actual notice of the lien before giving over its cargo. *Lykes Lines*, 398 F.3d at 323. "Actual notice can be given, for example, by incorporating the lien from the charter party in the bill of lading issued to the shipper or by providing a copy of the charter party to the shipper." *Id.*

The charter party between Royal White and Emar grants Emar a maritime lien on the cargo. It provides: "The Owners shall have a lien on the cargo and on all sub-freights payable in Respect of the cargo for freight, deadfreight, demurrage, claims for damages and for all other amounts due to under this Charter Party including costs of recovering same." (Docket Entry No. 25, Ex. B, p. 2, ¶ 8). The charter party lists Emar Shipping and Seatrade under "owners." (*Id.*, p. 1). Marcel A. El. Fadi, the president of Royal White, admits that Royal White executed the charter party with Emar Shipping. (Docket

Entry No. 34, Ex. A, ¶ 8). In support of its claim for a lien on the cement, Emar also submits the unsworn declaration of Antoine Hage, the president and general manager of Seachart Marine S.A.R.L. (Docket Entry No. 28, Ex. A). Hage states that Seachart acted as a broker to facilitate the use of the M/V SPRING DELI for the carriage of Royal White's cement and that Seachart secured the necessary agreements with Seatrade, Emar, and Royal White. (*Id.*, ¶¶ 4–9). Emar also submits evidence showing that it paid Seatrade for transporting the cement. (Docket Entry No. 28, Ex. B). In *Casper Marine, Inc. v. Seatrans Shipping Corp.*, 969 F. Supp. 395, 396 (E.D. La. 1997), the court found that an unsworn declaration and a statement showing the amount owed by the defendant made a "*prima facie* showing that plaintiff is entitled to the damages sought," supporting the court order attaching the cargo.

Royal White received actual notice of the lien against its cargo. The record shows that Royal White signed the charter party that created the lien. The page on which the lien appears is initialed by Royal White's representative. (Docket Entry No. 28, Ex. A-1, pp. 1–2). Royal White contends that Emar did not have authority to charter the M/V SPRING DELI to Royal White, but offers no evidence. Seatrade acknowledges Emar's authority to charter the vessel.[6] The declaration by Hage and the proof that Emar paid Seatrade for the carriage of cement make a *prima facie* case that Emar's charter party with

---

[6] This court notes that Emar's relationship to the shipment appears to be most like that of a subcharterer. In a subcharter, the person hiring out the vessel is the charterer. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 11-1 at 198 n.2. Subchartering is permissible unless precluded by the original charter. *The Ely*, 110 Fed. 563, 570 (S.D.N.Y. 1901), *aff'd* 122 Fed. 447 (2d. Cir. 1903).

Royal White is valid and supports a lien on the cargo.

Royal White argues that the bills of lading provided the contract of carriage for the cement. "The rule is that where there is a charter party the bill of lading operates as the receipt for the goods, and as a document of title passing the property of the goods, but not as varying the contract between the charterer and the shipowner." *Associated Metals & Minerals Corp. v. S/S JASMINE*, 983 F.2d 410 (2d Cir. 1993); *see also Steel Coils, Inc. v. M/V LAKE MARION*, 331 F.3d 422, 436 n.60 (holding that, when a charter party and a bill of lading are held by the same party, the charter party governs); *cf. Cargill Inc. v. Golden Chariot MV*, 31 F.3d 316, 318 (5th Cir. 1994) (when a bill of lading "has been transferred for value to a third party, not a party to the charter party, it constitutes an undertaking independent of the charter party as to provisions of the charter party expressly incorporated into it"). Royal White was a party to the charter party at issue. The charter party governs; Emar has a valid lien on the cargo.

### B. Is Emar Entitled to an Interlocutory Sale?

Emar seeks an interlocutory sale of the 1,325 metric tons of cement, the remaining arrested cargo. Rule E(9)(b)(i) of the Supplemental Rules provides:

> On application of a party, the marshal, or other person having custody of the property, the court may order all or part of the property sold — with the sales proceeds, or as much of them as will satisfy the judgment, paid into court to await further orders of the court — if:
>
> > (A) the attached or arrested property is perishable, or liable to deterioration, decay, or injury by being detained in custody pending the action;

> (B) the expense of keeping the property is excessive or disproportionate; or
>
> (C) there is an unreasonable delay in securing the release of the property.

Supplemental Rules for Certain Admiralty and Maritime Claims R. E(9)(b)(i). Each factor is an independent ground for interlocutory sale. *Silver Star Enters., Inc. v. M/V SARAMACCA*, 19 F.3d 1008, 1014 (5th Cir. 1994). Emar argues that all three factors are met in this case.

The cargo has been under arrest since August 17, 2005. Courts have held that a lapse of three and one-half months or more in securing the release of a vessel after its arrest constitutes an unreasonable delay. *See Silver Star*, 19 F.3d at 1014 (citing with approval *Ferrous Fin. Serv. Co. v. O/S Arctic Producer*, 567 F. Supp. 400, 401 (W.D. Wash. 1983), in which delay of four months was held unreasonable); *Bollinger Quick Repair, LLC v. Le Pelican MV et al.*, No. 00–308, 2000 U.S. Dist. LEXIS 9084 at *3–6 (E.D. La. June 20, 2000) (finding delay of four months unreasonable); *Neptune Orient Lines v. Halla Merchant Marine Co.*, No. 97–3828, 1998 U.S. Dist. LEXIS 3745 at * 21 (E.D. La. March 20, 1998) (finding delay of three and one-half months unreasonable). Securing the release of cement should not prove more difficult than securing the release of a vessel.

The cement is stored in a warehouse at a cost of $5,400 per month. (Docket Entry No. 21, p. 3). At the show cause hearing on October 18, 2005, the parties estimated the

value of the cargo at $74 per ton, which means that the remaining cargo of 1,325 metric tons of cement is worth approximately $98,050. As time passes, the expense of storing the property consumes more and more of the cargo's value and becomes excessive in relation to the value of the cargo.[7] The continued delay is unreasonable.

Emar also contends that the continued arrest of the cement risks decay, deterioration, and damage. Royal White has admitted that the cement under arrest has a shelf life of three months and that based on its arrest date, "the cargo is at the end of its shelf life and will or has begun to deteriorate. Every additional day the cargo remains under arrest subjects it to greater potential for deterioration." (Docket Entry No. 29, p. 5). In light of the acknowledged potential for deterioration, the unreasonable time to secure the cargo's release, and the excessive costs of continuing to store the cement, this court orders the interlocutory sale of the 1,325 metric tons of cement that remain in storage.

### III. Conclusion

Royal White's motion to vacate the arrest of the cargo is denied. Emar's motion

---

[7] The parties have not informed the court whether the cost of storage has decreased since the last partial release of cargo on November 14, 2005. This court finds that the $5,400 fee per month was also disproportional to the value of 1,825 metric tons of cement, approximately $135,050. As any decrease would presumably be proportional, the lesser amount of cement held under arrest does not affect this court's order of sale.

for the interlocutory sale of the cargo is granted. By separate order, this court directs the United States Marshal to sell the remaining cement.

SIGNED on December 6, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge