**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SEATRADE GROUP N.V., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-05-2771 |
| | § | |
| 6,785.5 METRIC TONS OF CEMENT, | § | |
| *in rem*, AND ROYAL WHITE | § | |
| CEMENT INC., *in personam*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Royal White Cement, Inc. moves for countersecurity under Rule E(7)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. (Docket Entry No. 54). Plaintiff-intervenor, Emar Shipping, has responded, (Docket Entry No. 57); Royal White has replied, (Docket Entry No. 58); and Emar has surreplied, (Docket Entry No. 59, Ex. A).[1] Based on the pleadings, the parties' submissions, and the applicable law, this court grants the motion for countersecurity but limits the amount to $130,000.00. The reasons for this decision are explained below.

**I.   Background**

Seatrade Group, Inc. filed this suit in August 2005, proceeding *in rem* and *in personam*, seeking "dead freight" charges that resulted when only 6,785.5 metric tons of

---

[1] Emar's motion for leave to file a surreply, Docket Entry No. 59, is granted.

cement were shipped on Seatrade's vessel from Egypt to Texas rather than the 8,000 tons that were set out in the charter party agreements. Emar intervened in September 2005, asserting that it had a valid maritime lien for the deadfreight charges because it had entered into a charter party for the shipment. The cargo was seized pursuant to the maritime lien. Seatrade later stipulated to a voluntary dismissal, leaving Emar's claim as a charterer/disponent owner of the vessel carrying the cement. This court held that Emar had a valid maritime lien and ordered Royal White to pay security in the amount of $130,000.00 to secure the release of its cargo from arrest.

The parties have entered into a binding agreement that calls for arbitration of their disputes in London. Royal White agrees that this case should be stayed pending the arbitration but filed a counterclaim in the amount of at least $160,000 and asked this court to award countersecurity in that amount before entering the stay. (Docket Entry No. 42). This court denied Royal White's original motion for countersecurity because Royal White had not specifically counterclaimed against Emar for losses sustained in shipping the 1,214.5 metric tons of cement left on the dock in Egypt. (Docket Entry No. 45). Royal White filed an amended answer and counterclaim in which it alleged that Emar is liable for losses resulting from the failure to ship the 1,214.5 tons of cement with the rest of the cargo in June 2005 as well as for diminution in the cargo's value.

Royal White seeks countersecurity from Emar in the amount of $160,000.00 for two categories of damages: ocean freight and stevedoring charges incurred in loading and

transporting to Houston the 1,214.50 metric tons of cement that was not shipped from Egypt with the remaining cargo, and damages for the diminution in value of the cement that was arrested by Emar and/or the costs of reconditioning and repackaging the arrested cement. Royal White alleged that the amount "collectively" was at least $160,000.00, without distinguishing between the categories of damage asserted. (Docket Entry No. 54 at 2).

## II.   Analysis

### A.   The Applicable Law

Rule E(7) provides in relevant part:

> When a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court for cause shown, directs otherwise. Proceedings on the original claim must be stayed until this security is given unless the court directs otherwise.

SUPPLEMENTAL RULES FOR CERTAIN ADMIRALTY AND MARITIME CLAIMS R. E(7)(a). The purpose of this rule is "to place the parties on an equality as regards security." *Washington-Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co.*, 263 U.S. 629, 638–39 (1924) (construing former Admiralty Rule 53). Although the language of the rule is automatic, it is not absolute; the original seizing complainant may be excused by the court "for cause shown." *Titan Navigation, Inc. v. Timsco, Inc.*, 808 F.2d 400, 403 (5th Cir. 1987). Determining whether cause is shown to require the payment of countersecurity, and in what amount, is within the trial court's discretion. *Titan*, 808 F.2d at 403; *First Md.*

*Leasecorp. v. M/V Golden Egret*, 764 F.2d 749, 758 n.4 (11th Cir. 1985). In exercising that discretion, a court must weigh "the importance of the security interest giving rise to the initial seizure, and the burden of posting countersecurity, against the potential injustice of requiring the defendant-counterclaimant to post security without affording reciprocal protection." *Titan*, 808 F.2d at 403. A court should consider whether the posting of countersecurity will prevent the plaintiff from prosecuting its claims, whether the countersecurity involves the release of seized property, whether the counterclaim is frivolous or so lacking in merit that it was advanced "solely to secure a negotiating advantage over the complainant," whether the counterplaintiff could have proceeded *in rem,* and the potential injustice of requiring one party to post security while the other party does not. *Id.*; *Afram Lines Int'l, Inc. v. M/V Capetan Yiannis*, 905 F.2d 347 (11th Cir. 1990); *Result Shipping v. Feruzzi Trading USA*, 56 F.3d 394 (2d Cir. 1995). The Fifth Circuit has stated that the "guidon for this analysis is the court's obligation to preserve the integrity of maritime liens. These vintage security devices endure and are protected because of their commercial usefulness. . . . [T]he ability of a ship's master to bind his vessel *in rem* continues to facilitate the prompt supply of goods and services." *Titan*, 808 F.2d at 404.

A court should not order countersecurity if it would diminish the utility of the maritime lien by unfairly or unreasonably inhibiting the plaintiff's prosecution of its case. "[T]he court must weigh the importance of the security interest giving rise to the initial seizure, and the burden of posting countersecurity, against the potential injustice of requiring

4

the defendant-counterclaimant to post security without affording reciprocal protection." *Id.* Courts should not require countersecurity in an amount so great that the original plaintiff is forced to give up his initial claim because he cannot produce the required countersecurity. *Id.* at 404–05. The fact that a party is financially unable to post countersecurity should not result in dismissal of its original claim. *Id.* at 403(citations omitted). Finally, "the court should not require countersecurity where the counterclaim is frivolous or so lacking in merit that the court can only conclude that the counterclaim was advanced solely to secure a negotiating advantage over the complainant." *Id.* at 404.

### B. The Diminution-in-Value Claim

Royal White seeks countersecurity for damages it alleges that it sustained from the diminution in the value of its arrested cargo and/or the cost of reconditioning and repackaging the cargo after the arrest. (Docket Entry No. 54 at 2). These damages flow from Royal White's counterclaim for the wrongful arrest of its cargo. (Docket Entry No. 52 at ¶ 6). As this court explained in its January 17, 2006 memorandum and order, a counterclaim for wrongful seizure is not a valid basis for requiring countersecurity under Rule E(7). *Incas & Monterey Printing & Packaging, Ltd. v. M/V SANG JIN*, 747 F.2d 958, 964–65 (5th Cir. 1984); *Result Shipping Co., Ltd. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394, 402 n.5 (2d Cir. 1995) ("[C]ountersecurity for a wrongful attachment counterclaim may not be required under Rule E(7) because the wrongful attachment would not have arisen out of the same transaction or occurrence with respect to which the action was originally filed.").

5

In *Incas*, the court explained that a counterclaim "in the nature of wrongful seizure or malicious prosecution" is not a compulsory counterclaim under Federal Rule of Civil Procedure 13(a) and therefore does not arise "out of the same transaction or occurrence" as the original action. 747 F.2d at 965. The court held that, "whether or not an action for wrongful seizure . . . may be asserted as a counterclaim in admiralty practice, counter-security under Rule E(7) may not be required for such a claim." *Id.* Royal White's motion for countersecurity is denied as to damages flowing from the allegedly wrongful arrest of its cargo.

### C.     The Claim for the Stevedoring and Ocean Freight Charges for the 1,214.50 Tons of Cement

Royal White seeks countersecurity for the damages it allegedly sustained in shipping the 1,215.50 metric tons of cement left on the docks in Egypt to Houston. (Docket Entry No. 54 at 2). Royal White submitted a copy of invoice # 086462, dated August 23, 2005, from Soceite Al Hilal for the transportation of 1196.13 metric tons of freight from Egypt to Houston at the rate of $90 per metric ton, totaling $107,652.50, and invoice # 086463, dated August 23, 2005, for "Handling Charges for 1196.13 mt at Alexandria port Including Storage and Clean up," also from Soceite Al Hilal, in the amount of $27,357.50. Both of these invoices have a handwritten note stating "paid on by wire 11/28/05 Mark." (Docket Entry No. 58, Exs. A, B). Royal White also submitted a copy of a wire transfer dated November 28, 2005, from Royal White to Al'Hilal Company in the amount of $153,089.00. (*Id.*, Ex. C). This wire transfer states that it is "payment on 86462, 86463, and 86467"; the

third invoice is not part of the record. The invoices at issue total $135,010.00. Royal White asserts a counterclaim for the costs it incurred in shipping the cement from Egypt to Houston after the plaintiff allegedly breached its contractual obligation to transport the entire 8,000 metric ton cargo when it left 1,215.50 metric tons of cement in Egypt. (Docket Entry No. 52 at ¶¶ 3–4). (In the complaint, the plaintiff alleged that Royal White breached the charter party terms when it packaged the cement in bags that were larger than expected, which could not be accommodated in the vessel and required a reduction in the shipment from 8,000 metric tons to 6,785.5 metric tons.)

Emar argues that this court should not order countersecurity because Royal White is not attempting to release its property from Emar's custody, citing *Afram Lines Int'l, Inc. v. M/V Capetan Yiannis*, 905 F.2d 347, 349 (11th Cir. 1990). In that case, the appellate court stated that a district court "should be reluctant to order countersecurity if the plaintiff does not, by the posting of countersecurity, seek to release its property from the counterplaintiff's custody." *Id.* The Eleventh Circuit did not forbid countersecurity in such circumstances, but cautioned that countersecurity should be less readily available when it is not intended to release the plaintiff's property that the defendant attached. *Id.*; *see also Expert Diesel, Inc. v. The Yacht "Fishin' Fool"*, 627 F. Supp. 432, 433 (S.D. Fla. 1986) (*favorably cited in Titan*, 400 F.2d at 404 n.6). The Second Circuit has rejected the suggestion in *Afram* that countersecurity may be inappropriate when a plaintiff is not seeking to have released property that the defendant has attached, holding that "[c]ountersecurity may be ordered

7

when the plaintiff has compelled the defendant to give security to satisfy the plaintiff's claim; it is not necessary that the defendant have previously taken possession of the plaintiff's property to satisfy the defendant's counterclaim." *Result Shipping*, 56 F.3d at 400 n.3 (citing *Washington-S.*, 263 U.S. 629, 639 (1924)).

In this circuit, the cases recognize that whether a defendant seeking countersecurity is also seeking to release attached property is one factor to be considered, but it is not determinative. *See, e.g.*, *Transportes Caribe, S.A. v. M/V Feder Trader*, 860 F.2d 637 (5th Cir. 1988) (affirming the award of countersecurity for a defendant counterclaiming for breach of a charter party agreement, without stating that the countersecurity was to obtain the release of attached property); *World Marine Transport & Salvage, Inc. v. Lykes Bros. S.S. Co., Inc.*, No. 93-1218, 1995 WL 529833 (E.D. La. Sept. 7, 1995) (stating that even though countersecurity was not sought to release the defendant's property and the counterclaim could not have been brought *in rem* or *quasi in rem*, it was nonetheless appropriate if it could be set in an amount that would be sufficient to put the parties on even ground without forcing the plaintiff to give up its claim); *Scindia Steam Navigation Co., Ltd. v. 3,952.536 Metric Tons Peerless Eagle Coal*, Nos. 95-0711, 95-0753, 1995 WL 731684 (allowing countersecurity despite absence of attached property). Whether a defendant is seeking the release of property is one factor for the court to consider in deciding if security is necessary to equalize the parties' positions and if compelling the plaintiff to post a bond to secure defendant's counterclaim would unfairly and unreasonably inhibit plaintiff's

prosecution of its case.

Emar also argues that because Royal White could not initially have brought its counterclaim *in rem* or *quasi in rem,* countersecurity should not be required. Emar cites *Afram* in support of this proposition. In *Afram,* the court stated that "[w]here the counterplaintiff could not have proceeded [*in rem* or *quasi in rem*], there seems little justification for ever requiring a larger bond on the counterclaim than is required in the original action." 905 F.2d at 349 (internal quotations omitted). In *Afram*, the court found that when the counterclaimant did not seek to release any of its property from the plaintiff's custody, and the claim could not have been filed *in rem* or *quasi in rem*, a district court could award countersecurity, but not "in an amount which exceeds the security posted on the original claim." *Id*. at 350. These arguments do not preclude the award of countersecurity in this case.

Emar also argues that Royal White's claim is frivolous. (Docket Entry No. 59 at 4). Emar argues that Royal White has produced only "two perfunctory invoices" for freight and stevedoring. (Docket Entry No. 57 at 5). Emar contends that cement cargos of Egyptian origin are exempt from storage charges; that its investigation showed no record that the claimed $27,357.50 in storage charges were charged; that Sun Line Shipping Agencies Company, the Alexandria shipping agency involved in loading the vessel, explained in a letter to Emar that the going rate for ocean freight for cement cargos from Alexandria to the United States is $45.00 to $55.00 per metric ton—not the $90 per metric ton claimed by

9

Royal White—and that the Alexandria Terminal and Port authorities disclosed to Sun Line that the cargo of 1196 metric tons of cement at issue was not shipped by itself, but as part of a shipment of 10,000 metric tons on the M/V APOLLO, all of which belonged to Royal White, at a rate of $48.00 per metric ton. (Docket Entry No. 57 at 6–7; Docket Entry No. 57, Exs. 1–8). Emar further alleges that Soceite Al-Hilal, the company that ostensibly issued the invoices Royal White submitted, does not conduct port operations in Alexandria and is owned by individuals who, according to Emar, are likely related to the owner of Royal White, El Fadi. (*Id.* at 8; Docket Entry No. 57, Ex. 7–8). In response to Emar's challenge, Royal White submitted a copy of the wire transfer showing that the invoices were paid and argued that it cannot, and should not be required to, prove its claim on the merits to justify countersecurity.

The Fifth Circuit has held that countersecurity should not be required "where the counterclaim is so frivolous or so lacking in merit that the court can only conclude that the counterclaim was advanced solely to secure a negotiating advantage over the complainant." *Titan*, 808 F.2d at 404. Emar raises grounds to challenge Royal White's ability to recover on its counterclaim. That does not equate to a showing of frivolousness. One court has neatly explained the rule and the problem it poses for a judge:

> The premise that countersecurity will not be required on the basis of frivolous counterclaims is a sound one. It would hardly put the parties on an even footing to permit one side to obtain security on the basis of totally frivolous claims, simply because its adversary had obtained security on the basis of a non-frivolous claim. However, a court's ability to understand the

> merits of a dispute at an early stage is limited, and courts should be reluctant to prejudge the merits of claims based essentially on the pleadings and a sparse record consisting of a few documents, in advance of any discovery. This is particularly so when the ultimate merits will be decided not by this Court, but by an arbitration panel in another country.

*Finecom Shipping Ltd. v. Multi Trade Enterps. AG*, No. 05-6695, 2005 WL 2838611, at *1 (S.D.N.Y. Oct. 25, 2005).

On the current sparse record, this court cannot say that Royal White's counterclaim is frivolous. There appear to be factual disputes, to be resolved by the arbitrators, about whether the decision to leave a portion of the 8,000 metric ton cement cargo on the dock breached the parties' agreement; and, if so, whether Royal White sustained damages in shipping the remaining cement; and, if so, in what amounts.

The record does not show, nor does Emar contend, that it is unable to pay countersecurity. The facts do not suggest that Emar would be forced to give up its initial claim because its cannot produce the required countersecurity for the counterclaim. *See Titan*, 808 F.2d at 404–05. The record also shows that Royal White does have a legitimate basis for requesting countersecurity.[2] Royal White argues that Emar is an "overseas business entity of unknown business form, unknown location, and unknown assets." (Docket Entry No. 58 at 5). Royal White, by contrast, is headquartered in this district and has its principal office here. Royal White, in that sense, has security concerns that are different from Emar's

---

[2] Although Royal White protests that it is a David and Emar a Goliath, this appears overstated. Royal White is based in Houston, Texas, but it has offices in three other locations, including one in China. http://www.royalwhitecement.com (follow "Locations" hyperlink).

11

and that, in this context, justify the imposition of countersecurity. *See, e.g.*, *Golden of La. v. Coutinho Caro & Co.*, No. 98-2883, 1999 WL 135296, at * 2 (E.D. La. Mar. 11, 1999) (countersecurity was not required when the plaintiff/counterdefendant was in the district, was not mobile, and did not present collection concerns).

In this case, the facts that the countersecurity is not sought to release attached property and that Royal White's counterclaim could not have been brought *in rem* or *quasi in rem* do not preclude countersecurity, but weigh heavily in favor of not requiring an amount that exceeds the security posted on the original claim, $130,000.00. This court does not find Royal White's counterclaim frivolous so as to preclude countersecurity. Nor does this court find that ordering countersecurity, limited to the amount of $130,000.00, will unfairly burden Emar or impede the effectiveness of its maritime lien. Rather, countersecurity limited to that amount will put the parties on an equal footing with regard to security.

Accordingly, within 10 days, Emar is ordered to provide countersecurity in the amount of $130,000.00 to secure Royal White's counterclaim for the damages sustained in stevedore and shipping costs to transport the 1,214.5 metric tons of cement from Egypt to Houston.

## III.    Conclusion

Royal White's motion for countersecurity is granted as to its claims for stevedoring and ocean freight charges incurred in shipping 1,214.5 metric tons of cement from Egypt to

the Port of Houston after that cement was not shipped aboard the M/V SPRING DELI in July 2005, and denied as to its claims for damages from the wrongful arrest of its cargo, including diminution in value.

Emar Shipping is ordered to pay $130,000.00 in countersecurity into the registry of this court within 10 days from the date this order is entered, to be held by the United States District Clerk for the Southern District of Texas, to secure Royal White's counterclaims against Emar Shipping in this action.

In accordance with this court's memorandum and order of April 27, 2006, this case is stayed and administratively closed pending arbitration. It may be reinstated to this court's active docket by motion filed by either party within 30 days after the conclusion of the arbitration proceedings.

SIGNED on August 2, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge